UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT BAGLEY,

                Plaintiff,

      - against -

J.P. MORGAN CHASE & CO.,

                Defendant.

**MEMORANDUM
OPINION & ORDER**

10 Civ. 1592 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Robert Bagley alleges that defendant J.P. Morgan Chase Bank, N.A. ("Chase") retaliated against him for opposing unlawful discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq., and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-101 et seq. Plaintiff claims that his supervisors directed him to "rate his staff's performance in an unjustified negative manner which would adversely affect the older workers who were reporting to him," and that when he complained that this practice constituted age discrimination, he was terminated. (Cmplt. ¶¶ 16, 18, 22)

        Defendant has moved for summary judgment on all of Plaintiff's claims. For the reasons stated below, Defendant's motion for summary judgment will be denied.

# BACKGROUND

## I.    PLAINTIFF'S EMPLOYMENT AT CHASE

Bagley worked for Chase and its predecessors for approximately 27 years prior to his termination on July 14, 2009.  (Def. R. 56.1 Stmt. ¶¶ 1-2; Bagley Aff. ¶ 3)[1]  At the time of his termination, Bagley was an assistant vice president and managed Chase's Treasury and Securities Services ("TSS")/Worldwide Securities Services ("WSS") business, supervising a staff of 20 employees.[2]  (Def. R. 56.1 Stmt. ¶¶ 2, 4; Pltf. R. 56.1 Resp. ¶¶ 2, 4)  All of these employees were over the age of 40, and most were over 50 years old.  (Def. R. 56.1 Stmt. ¶ 4; Pltf. R. 56.1 Resp. ¶ 4; Bagley Dep. 60)

Between 2000 and his termination in July 2009, Bagley reported to Executive Director Anthony Tufano.  (Def. R. 56.1 Stmt. ¶ 5; Pltf. R. 56.1 Resp. ¶ 5; Tufano Dep. 21)  During the relevant time period, Tufano reported to Eric Carr, WSS Operations Manager.  (Def. R. 56.1 Stmt. ¶ 6; Pltf. R. 56.1 Resp. ¶ 6; Carr Dep. 34; Bagley Dep. 40)

---

[1]  This Court relies on facts drawn from a party's Local Rule 56.1 statement where the opposing party has admitted those facts or has not controverted them with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where Plaintiff disagrees with Defendant's characterization of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

[2]  Bagley was responsible for managing the safekeeping of Chase clients' securities and for facilitating the transfer of these assets into the bank's nominee name and depository accounts for the purpose of collecting income and dividends.  (Pltf. R. 56.1. Stmt. ¶ 102; Def. R. 56.1. Resp. ¶ 102)

## II.   PLAINTIFF'S CONCERNS ABOUT AGE DISCRIMINATION

In late 2008, Bagley became concerned that Carr and Tufano were targeting older employees on his staff for eventual termination.[3]  Bagley's concerns arose in the context of the 2008 year-end performance review process.  Although Bagley had previously been permitted to determine the ratings for his staff, in late 2008 Tufano directed Bagley to rate four of his employees as "low meets expectations" and one employee as "Needs Improvement."[4]  (Pltf. R. 56.1 Stmt. ¶¶ 275-77; Bagley Dep. 46-47, 138)  Accordingly, Bagley had no input into the ratings for these employees, four of whom were over 50 years old.  (Pltf. R. 56.1 Stmt. ¶ 280; Def. R. 56.1 Resp. ¶ 280; Bagley Dep. 46, 138)

Employees who receive a rating of "low meets expectations" or "Needs Improvement" are placed on a performance improvement plan ("PIP"), which creates an "opportunity for [Chase] to terminate them."  (Bagley Dep. 74)  Because four out of the five employees selected to receive low ratings in their 2008 year-end evaluations were over 50 years old, Bagley believed that the ratings mandated by Tufano reflected age discrimination.  (Bagley

---

[3]  Carr was approximately 38 to 39 years old in 2008 and 2009; Tufano was 44 to 45 years old in 2008 and 2009.  (Carr Dep. 12; Tufano Dep. 9)

[4]  Chase provided performance evaluation guidelines for managers responsible for the TSS/WSS unit.  These guidelines were set forth in a written "Manager Briefing" entitled "Using the 20/70/10 Approach in TSS" (the "Manager Briefing").  (Def. R. 56.1 Stmt. ¶ 7; Pltf. R. 56.1 Resp. ¶ 7; Dx 7)  The Manager Briefing provides that an employee's "[p]erformance should be evaluated based on both individual performance as well as a comparison to the performance of others in similar roles and/or with similar levels of responsibility. . . ."  (Dx 7 at 01036) (emphasis in original)  The Manager Briefing further provides that managers "should arrive at an overall distribution that is close to 20/70/10" – meaning that approximately 20% of employees receive a rating of "Exceeds Expectations," the middle 70% of employees receive a rating of "Meets Expectations," and the bottom 10% of employees receive a rating of "Needs Improvement."  (Id.) (emphasis in original)  Within the "Meets Expectations" category, employees may be rated "M1," signifying "high meets expectations," "M2," representing "meets expectations," or "M3," meaning "low meets expectations."  (Tufano Dep. 71)  The Manager Briefing states that "managers should exercise common sense – [the 20/70/10 guidelines] should not be viewed as a precise quota such that individuals receive ratings that do not reflect their contribution."  (Dx 7 at 01036)

Dep. 46-47, 138)  Despite these concerns, Bagley issued 2008 year-end ratings consistent with

Tufano's instructions.  (Pltf. R. 56.1 Stmt. ¶¶ 282-83; Px 32-39)

        Bagley's belief that Carr and Tufano were targeting older employees for

termination was informed by age-related remarks made by Carr.[5]  For example, in early 2009,

Tufano told Bagley that Carr – after reviewing an email listing the years of service of several

members of Bagley's staff – had asked Tufano, "What are you running, an old age home over

there?"  (Def. R. 56.1 Stmt. ¶ 53; Pltf. R. 56.1 Resp. ¶ 53; Bagley Dep. 62; Cmplt. ¶ 13)  In April

2009, in reference to a 60-year-old employee on Bagley's staff, Carr asked Bagley, "Wouldn't

you like to have a 30-year old with her knowledge?"  (Pltf. R. 56.1 Stmt. ¶ 397; Def. R. 56.1

Resp. ¶ 397)  During a May 2009 staff meeting, at which Bagley and Tufano were present, Carr

asked one of Bagley's fellow managers, Annette Gallicchio – then in her mid-fifties – whether

she was too old to do her job.  (Def. R. 56.1 Stmt. ¶ 58; Pltf. R. 56.1 Resp. ¶ 58; Bagley Dep. 67-

68; Gallicchio Dep. 22)  Gallicchio – who understood Carr's comment as suggesting that she had

less energy than a 30-year old – protested that she could "run circles around most thirty-year

olds."  (Bagley Dep. 67-68; Gallicchio Dep. 22)  Bagley was also troubled by terminations of

older employees in other units at Chase, which he viewed as discriminatory.  (Bagley Dep. 46)

        In February or March 2009 – in preparation for the 2009 mid-year performance

review – Tufano and Carr advised Bagley that they expected him "to aggressively rate" his

staff's performance.  (Def. R. 56.1 Stmt. ¶ 11; Pltf. R. 56.1 Resp. ¶ 11)  Based on his experience

with the 2008 year-end performance review process, and Carr's age-related remarks, Bagley

believed that he was being asked "to target the older workers."  (Bagley Dep. 72)  Bagley

testified that he "was expected to rate the older workers, either an M-3 [low meets expectations]

---

[5]  Bagley asserts that Carr was the "driving force" behind the targeting of older workers.  (Bagley
Dep. 61)

or an N [Needs Improvement], which would put them on a performance improvement plan

["PIP"].  Once you get on a performance improvement plan . . . that was the opportunity for

[Chase] to terminate them."  (Bagley Dep. 74)  Because Bagley believed that the performance

review process was being used improperly to justify adverse employment actions against older

employees, he did not wish to participate in the evaluation process.  (Bagley Dep. 42)

On March 25, 2009, Bagley sent an email to Carr stating that, "in the event of a

downsizing within my department, I would like to be seriously considered for a severance

package."  (Dx 9; Bagley Dep. 42)  Bagley told Carr that "[m]anaging staff has never been one

of my strong suits and I would like to be able to pursue the chance to do something that does not

involve managing."  (Dx 9)  Bagley testified that he sent the March 25, 2009 email in order to

"remove [himself] from having to participate in the age discrimination through the performance

review process."  (Bagley Dep. 42)  Prior to sending the March 25, 2009 email, Bagley had

spoken with Carr once or twice about his request for a demotion or a severance package.  (Def.

R. 56.1 Stmt. ¶ 13; Pltf. R. 56.1 Resp. ¶ 13; Bagley Dep. 46)

On June 2, 2009, Bagley sent an email to Carr and Tufano informing them that he

intended to "rate all of [his staff members] an M [Meets Expectations]" with the exception of

three employees who deserved an "M1" rating.  (Def. R. 56.1 Stmt. ¶ 14; Pltf. R. 56.1 Resp. ¶

14; Dx 10)  Bagley told Carr and Tufano that none of his staff deserved a ranking of "low meets

expectations" or "Needs Improvement," and that if they intended to mandate such a rating "then

the review/PIP process will have to be handled by someone who feels they deserve that ranking."

(Dx 10; Bagley Dep. 84-85)  Bagley noted that while some employees could "improve certain

aspects of their performance," "none of them deserve to be put in a position where they will get

no raise or possibly [be terminated].  I can't justify fitting people into categories that I feel they

do not deserve." (Dx 10)  Bagley also commented that his "management style may not fit in

with the way the company is moving."  Bagley intended this remark to communicate that he

"wouldn't force [negative] rankings on older workers that didn't deserve them."  (Id.; Bagley

Dep. 92-93)

        In a June 4, 2009 email response, Carr told Bagley that his "view on this topic [of

evaluations] is not realistic given the overall direction of [Chase].  This is not a singular view just

across the vault or WSS but a view across the entire firm."  (Dx 11)

        Bagley went on to prepare mid-year performance reviews for only eleven

members of his staff.  He refused to prepare reviews for the remaining nine staff members

because he "didn't agree with" the ratings assigned to them, and believed that these ratings were

"done because of the staff members['] ages."  (Def. R. 56.1 Stmt. ¶ 17; Pltf. R. 56.1 Resp. ¶ 17;

Bagley Dep. 148)  Tufano and Carr completed performance evaluations for the remaining nine

staff members, all of whom apparently received a rating of "low meets expectations" or "Needs

Improvement."[6]  (Def. R. 56.1 Stmt. ¶ 18; Def. R. 56.1 Resp. ¶¶ 368-69, 443, 446; Pltf. R. 56.1

Resp. ¶ 18; Pltf. R. 56.1 Stmt. ¶¶ 368-69, 443, 446; Dx 12 at PL 00102, 14; Px 66; Bagley Dep.

58; Tufano Dep. 196-97)

## III.    PLAINTIFF'S OBJECTIONS TO ALLEGED AGE DISCRIMINATION

        Beginning in late 2008, Bagley complained repeatedly to Tufano that the

performance review process was being used to justify discrimination against older employees.

(Bagley Dep. 44, 46-48, 77-78, 138)  For example, Bagley told Tufano in connection with the

December 2008 year-end performance evaluation process that he believed that Defendant was

---

[6]  The parties dispute whether a third, unnamed manager participated in rating the remaining nine
staff members.  While Chase alleges that Carr, Tufano, and "one of Plaintiff's management
peers" prepared the performance reviews (Def. R. 56.1 Stmt. ¶ 18; Dx 14), Bagley denies that
any of his peers played a role in these evaluations.  (Pltf. R. 56.1 Resp. ¶ 18; Px 66)

"discriminating against the older people because, first of all, [the managers] were given the rankings [for their employees].  [They] weren't even asked . . . [for their] input on them." (Bagley Dep. 46-47)  Also in December 2008, Bagley told Tufano that another unit at Chase had terminated several older employees, raising concerns that Chase was discriminating against those employees based on age.  (Bagley Dep. 46; Tufano Dep. 83)

Bagley also made age discrimination-related complaints to Tufano in January or February 2009 (Pltf. R. 56.1 Stmt. ¶ 387; Def. R. 56.1 Resp. ¶ 387; Bagley Dep. 62-64), and again in March or April 2009, when he told Tufano that he believed he was being asked to evaluate his staff in a manner that would adversely affect older employees.  (Bagley Dep. 71, 77-79; Pltf. R. 56.1 Stmt. ¶ 389)

Bagley also complained to Tufano about Carr's age-related comments.  For example, in April 2009 Bagley reported Carr's comment about one of Bagley's 60-year-old colleagues – "Wouldn't you like to have a 30-year-old with her knowledge?"  (Pltf. R. 56.1 Stmt. ¶ 397; Def. R. 56.1 Resp. ¶ 397, Bagley Dep. 64)  In response to Bagley's complaints, Tufano "said there was really nothing he could do about it."  (Def. R. 56.1 Stmt. ¶ 52; Pltf. R. 56.1 Resp. ¶ 52; Bagley Dep. 64-65)

On July 2, 2009, Bagley complained to Mariela Recio of Chase's Human Resources Department (Recio Dep. 31-32) that the "performance review process was geared against the older workers."  (Bagley Dep. 111, 145-46)

## IV.     PLAINTIFF'S TERMINATION

On June 10, 2009, Carr and Tufano issued Bagley's mid-year performance evaluation.  They gave Bagley an "N" rating, signifying "Needs Improvement."  (Def. R. 56.1 Stmt. ¶ 19; Pltf. R. 56.1 Resp. ¶ 19; Dx 12 at PL 00102; Bagley Dep. 142)  Chase contends that

Bagley received this rating because he "would not perform his managerial duties" – that is, complete performance evaluations for all the members of his staff.  (Def. R. 56.1 Stmt. ¶ 19; Carr Dep. 204; Dx 12 at PL 00102)  Bagley claims that "Carr and Tufano downgraded plaintiff's ranking from 'Low Meets Expectations' to 'Needs Improvement' in retaliation for Bagley's complaints about age discrimination against his staff in connection with the performance management process."  (Pltf. R. 56.1 Resp. ¶ 19; Bagley Dep. 99)

>    Bagley's performance evaluation states, in pertinent part:

> [f]or the mid[-]year review process this year, [Bagley] was unprepared to provide honest feedback on his staff and entered the mid[-]year review session with a negative view of the firm[']s standard around staff ranking. . . . [Bagley] is unable to deliver a hard message to his staff and chooses to ignore the fact that some staff members do not perform on par with their peers across operations and should not be compared to others performing like functions.  As a result of his limited staff feedback his manager was forced to complete [mid-year] rankings for [Bagley's] team. . . . [Bagley] has indicated that he cannot and will not deliver the performance ratings, PIP's or negative feedback.  [Bagley] was informed by . . . Carr that this lack of action will directly affect his ability to perform his role as manager of the team which [Bagley] acknowledged and accepted.

(Dx 12 at PL 00102)

>    On June 12, 2009, Carr contacted Mariela Recio of Chase's Human Resources

Department to discuss taking disciplinary action against Bagley.[7]  (Def. R. 56.1 Stmt. ¶ 21; Dx

---

[7]  Chase's "Corrective Action Policy" governs discipline of employees.  (Def. R. 56.1 Stmt. ¶ 40; Pltf. R. 56.1 Resp. ¶ 40; Dx 21)  The Policy provides that "[i]f an employee's performance or conduct does not meet expectations, his or her manager should speak with the employee about the specific performance or conduct problem and the actions needed to correct the problem." (Id. at 00171)  The Policy lists several steps in the disciplinary process prior to termination:  (1) "coaching and counseling"; (2) "written warning"; and (3) "restrictions period."  (Dx 21) "Following coaching and counseling, if an employee has not made the specified improvements or has developed a new performance or conduct problem, he or she will typically receive a written warning from his or her manager."  (Id.)

Chase's Policy further states:

13; Recio Dep. 136-37; Px 70)  According to Recio's notes, Carr told her that Bagley had

"advised his [manager] and 2 levels up [manager] that he does not believe in the current process

and wishes not to participate with his [employees.]  As a result, [Bagley's] next level [manager]

is completing the performance review process for [Bagley's] direct[ ] [supervisees.]"  (Px 70)

Recio's notes also indicate that Carr wanted Bagley placed on written warning and that Recio

advised him "to draft [the] warning and send [it] to [her] for review."  (Id.)

On June 15, 2009, Bagley made a written submission objecting to the "N" rating:

> I do not agree that I should have been rated an N.  While most of the comments
> are accurate regarding the performance review process, I disagree with the
> statement that I was unprepared to provide honest feedback about my staff.  I
> have never been anything but honest in any of my dealings with anyone either in
> authority, on my level or anyone reporting to me in 27 years I have been
> employed here.  Three months ago, I approached Mr. Carr with my concerns
> about the direction management was taking regarding performance reviews and
> that I felt that I would not be a good fit and be able to deliver the right message.  I
> said that he needed to have managers there that were able to deliver these
> messages and that perhaps I would be better suited to a non management role or if
> one was not available, to be considered for a severance package because I had
> heard that there was possibly going to be a reduction in staff.  He stated that I
> would not be asked to do anything I was uncomfortable with.  In the next meeting
> he stated to me he couldn't justify having me involved in the downsizing.
> Recently, I sent an email stating that I felt that none of my staff members are in
> the M3 or N category and that I would not feel comfortable writing these reviews
> if they were rated as such and would not be willing to write them.  I still feel that
> way. . . .

(Dx 12 at 00103)

---

"[t]he corrective action guidelines . . . are not rigid steps, and any of them may be omitted
from the corrective action process.  In other words, a written warning or immediate
termination may occur at any time without any prior coaching or counseling if, in the
manager's judgment, the situation calls for such action.  Examples of behaviors that may call
for alternate or abbreviated corrective action or immediate termination include, but are not
limited to, insubordination, misconduct, breach of trust, dishonesty, negligence or violation
of any provisions of the firm's policies, including the HR policies and the firm's Code of
Conduct."  (Id.)

On June 17, 2009, Carr submitted a memorandum to his supervisor, Brian G. Urkowitz, recommending "that written warning [to Bagley] be bypassed and [that] we pursue termination [immediately]."[8]  (Def. R. 56.1 Stmt. ¶ 24; Pltf. R. 56.1 Resp. ¶ 24; Dx 14)  In recommending immediate termination, Carr notes that "[t]he review process <u>requires</u> a 20/70/10 split among staff within the department broken down into three ratings categories of E [Exceeds Expectations]/M [Meets Expectations]/N [Needs Improvement] respectively.  Further breakdown of the 'M' category reflects a 20/40/10 split which represents M1/M2/M3 rankings respectively . . . . [Bagley] refuses to follow [Chase's] criteria and evaluate his staff fairly based on their daily performance, against their peers and in[ ]line with [Chase] standards and guidelines.  [Bagley] insists that his entire staff . . . ranks as either M1 or M2 with no exception."  (Dx 14) (emphasis added)

On June 24, 2009, Carr called Jennifer Wheatley, a Chase Employee Relations Manager, and told her that he wanted to bypass the written warning process and arrange for Bagley's immediately termination.  (Wheatley Dep. 86, 122-23; Def. R. 56.1 Stmt. ¶ 25; Pltf. R. 56.1 Resp. ¶ 25; Dx 15; Px 73)  After their call, Carr emailed Wheatley the termination request he had sent to Urkowitz.  (Px 76)  On June 30, 2009, Wheatley recommended to Carr that Bagley be given a written warning and an opportunity to comply, failing which the "next step would be termination of employment."  Carr agreed to this approach.  (Def. R. 56.1 Stmt. ¶ 26; Pltf. R. 56.1 Resp. ¶ 26; Dx 15; Wheatley Dep. 148-49)

On July 1, 2009, Tufano issued a written warning to Bagley.  Tufano had prepared the warning with input from Carr.  (Dx 16; Bagley Dep. 104-105; Tufano Dep. 164-65)  The warning stated that Bagley was

---

[8]  Tufano – Bagley's direct supervisor – was not aware that Carr had taken this action.  (Tufano Dep. 173)

unwilling to fully participate in the mid[-]year review and inter-ranking process
adopted by the firm (which began in May '09). [Bagley] has openly voiced his
dissatisfaction with the process and makes little effort to conform to the Firm's
review standards or to follow the Firm's criteria to fairly evaluate his staff based
on performance against their peers and or within the Firm's standards and
[guide]lines. This has [caused] a downstream [e]ffect on his employees' potential
development as [Bagley] also refuses to create or administer PIP's which . . .
reflect the . . . staff's current performance ratings. These actions limit his ability
to fulfill his job responsibilities as a Manager which include staff assessments and
development for mid and end of year reviews.

(Dx 16)

The written warning listed the following "management expectations":

[Bagley] must execute on the following:  1) change his approach to the review
and performance improvement process as outlined within Firm guidelines 2) work
to accept the Firm[']s standards around staff performance relative to their peers
and delivering on objectives and departmental expectations 3) focus on driving
and accepting change both personally and with respect to staff performance
standards 4) deliver on Firm objectives regarding performance improvement for
low performing staff and subsequently creating, delivering and monitoring
improvement plans.  If [Bagley] is unable to 1) accept change and agree to deliver
on the Firm[']s objectives around performance 2) prepare & deliver fair and
accurate inter[-r]anking based on Firm standards including the creation and
delivery of performance improvement plans for identified staff he will be unable
to fulfill his obligation, duties and responsibilities as department manager which
will subsequently result in the termination of his employment with [Chase].

(Id.)

On July 2, 2009, after receiving the written warning, Bagley complained to

Mariela Recio of the Human Resources Department "about Carr and Tufano's discriminatory

plan."  (Def. R. 56.1 Stmt. ¶ 30; Pltf. R. 56.1 Resp. ¶ 30; Dx 18; Bagley Dep. 110-12; Recio Dep.

220, 224-25)  Bagley told Recio that "the performance review process was bias[ed] against the

older workers" and that it was "geared against the older workers."  (Bagley Dep. 111)  Bagley

claims that Recio refused to respond to his concerns, and instead repeatedly stated that "this is

the way the reviews have to be done, even if you don't agree with them. . . ."[9]  (Bagley Dep.

111)

On July 14, 2009, Carr and Tufano met with Bagley to terminate his employment.
(Def. R. 56.1 Stmt. ¶ 33; Pltf. R. 56.1 Resp. ¶ 33; Bagley Dep. 113-14)  They told Bagley that he
was being terminated because he failed to comply with the requirements of the performance
review process.  (Bagley Dep. 113)  Bagley restated his position that he was uncomfortable
participating in the performance review process because he believed that the ratings were not
"true rankings" but instead were "based on age."  (Bagley Dep. 151)

## V.    PROCEDURAL HISTORY

On September 25, 2009, Bagley filed a Charge of Discrimination with the EEOC
alleging that Chase had retaliated against him based on his complaints about age discrimination.
(Cmplt. ¶ 3; Dx 27)  The EEOC issued Bagley a Notice of Right to Sue letter on February 4,
2010.  (Cmplt. ¶ 3; Dx 28)  The Complaint in this action was filed on February 26, 2010.  (Dkt.
No. 1)

## DISCUSSION

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no
genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."
FED. R. CIV. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes
where the evidence is such that a reasonable jury could decide in the non-movant's favor."
Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d

---

[9]  Recio's notes do not reflect that Bagley voiced any concerns about age discrimination during
their conversation (Dx 18), and Recio testified that Bagley did not mention age when he
complained about the evaluation process.  (Recio Dep. 257-58)

140, 145 (2d Cir. 2007)).  In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Cifra, 252 F.3d at 216.

       "In cases based on allegations of discriminatory retaliation, courts must use 'an extra measure of caution' in determining whether to grant summary judgment 'because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence.'"  Thompson v. Morris Heights Health Ctr., No. 09 Civ. 7239(PAE)(THK), 2012 WL 1145964, at *4 (S.D.N.Y. Apr. 6, 2012) (quoting Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)); see also Ukeje v. New York City Health and Hosp. Corp., 821 F. Supp. 2d 662, 668 (S.D.N.Y. 2011) ("When a case turns on the intent of one party, as employment discrimination and retaliation claims often do, a 'trial court must be cautious about granting summary judgment.'  Because the employer rarely leaves direct evidence of its discriminatory or retaliatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions."); Batyreva v. New York City Dep't of Educ., No. 07 Civ. 4544(PAC)(DF), 2010 WL 3860401, at *11 (S.D.N.Y. Oct. 1, 2010) ("Due to the highly fact-specific nature of the inquiry, an extra measure of caution is needed in awarding summary judgment to a defendant where, as in a discrimination or retaliation case, intent is at issue.").

       However, "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (internal quotation marks and citations omitted).  As in any other case, a plaintiff in a retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts.'

. . . [H]e must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). "Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion. Gross v. Nat'l Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").

## II.    APPLICATION OF LAW GOVERNING RETALIATION CLAIMS

The anti-retaliation provisions of the ADEA make it "unlawful for an employer to discriminate against any of [its] employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such an individual . . . participated in any manner in an investigation, proceeding, or litigation under this [Act]." 29 U.S.C. § 623(d).

ADEA retaliation claims are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[10] See Jetter v. Knothe Corp., 324 F.3d 73, 75 (2d Cir. 2003) ("We analyze ADEA discrimination (and retaliation) claims under the burden-shifting framework of [McDonnell Douglas]."); Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 94 (2d Cir. 2001) ("We analyze a claim of retaliatory discharge under the

---

[10] Claims under the NYSHRL are analyzed under the same standard. See Sotomayor v. City of New York, No. 10-CV-3411(JBW), 2012 WL 1889780, at *29 (E.D.N.Y. May 24, 2012) ("In order to establish a prima facie case of retaliation under Title VII, the ADEA, the NYSHRL, and § 1983, 'an employee must show (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'") (quoting Feingold v. New York, 366 F.3d 138, 156 (2d Cir. 2004)). "The essential elements of a retaliation claim under the NYCHRL are the same. Yet the employer's conduct need not be as severe to trigger liability. Unlike under federal and state law, the employer's actions need not be 'materially adverse' to the plaintiff, but merely 'reasonably likely to deter a person from engaging in protected activity.'" Id. (quoting N.Y.C. Admin. Code § 8-107(7)).

familiar three-part burden shifting analysis that was . . . first set forth in <u>McDonnell Douglas</u>.").

Under that framework, the plaintiff bears the initial burden of establishing a <u>prima facie</u> case of

retaliation.  See <u>Gorzynski v. Jet Blue Airways Corp.</u>, 596 F.3d 93, 106 (2d Cir. 2010).  "The

plaintiff's burden at [the <u>prima facie</u>] stage is slight – he may establish a <u>prima facie</u> case with <u>de</u>

<u>minimis</u> evidence."  <u>Wanamaker v. Columbian Rope Co.</u>, 108 F.3d 462, 465 (2d Cir. 1997).

If the plaintiff satisfies this initial burden, "the burden shifts to the defendant to

articulate 'some legitimate, nondiscriminatory reason' for its [retaliatory] action."  <u>Gorzynski</u>,

596 F.3d at 106 (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802).  "If the defendant provides such

a reason, the motion [for summary judgment] may still be denied if the plaintiff can show that

the defendant's proffered reason was a pretext for retaliation."  <u>Beaumont v. Cablevision Sys.</u>

<u>Corp.</u>, No. 10-CV-3585(JG)(SMG), 2012 WL 1158802, at *4 (E.D.N.Y. Apr. 9, 2012) (citing

<u>Gorzynski</u>, 596 F.3d at 106).

### A.   Prima Facie Case

In order to make out a <u>prima facie</u> case of retaliation under the ADEA,

> a plaintiff must adduce "evidence sufficient to permit a rational trier of fact to find
> [1] that [ ] he engaged in protected participation or opposition under . . . [the
> ADEA], [2] that the employer was aware of this activity, [3] that the employer
> took adverse action against the plaintiff, and [4] that a causal connection exists
> between the protected activity and the adverse action, i.e., that a retaliatory motive
> played a part in the adverse employment action."

<u>Kessler v. Westchester Cnty. Dep't of Social Servs.</u>, 461 F.3d 199, 205-06 (2d Cir. 2006)

(quoting <u>Cifra</u>, 252 F.3d at 216 (internal quotation marks omitted)); <u>see</u> <u>also</u> <u>Graves v. Deutsche</u>

<u>Bank Sec. Inc.</u>, No. 07 Civ. 5471(BSJ), 2010 WL 997178, at *3 (S.D.N.Y. Mar. 18, 2010)

(same); <u>Santos v. Brooks Pharm.</u>, No. 3:05-cv-889(WWE), 2008 WL 185534, at *5 (D. Conn.

Jan. 18, 2008) (same).

Here, for purposes of its summary judgment motion, Chase concedes that Bagley has satisfied the first three elements of his <u>prima facie</u> case.  (Def. Br. 12)  Chase argues, however, that Bagley "cannot . . . establish a causal connection between his alleged 'complaints' and the adverse action taken against him."  (<u>Id.</u>)

"A causal connection between the protected activity and the adverse action may be demonstrated by showing '(1) direct proof of retaliatory animus directed against the [p]laintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory action occurred close in time to the protected activities.'"  <u>Elhanafy v. Shinseki</u>, No. 10 CV 3192(JG), 2012 WL 2122178, at *17 (E.D.N.Y. June 12, 2012) (quoting <u>Ashok v. Barnhart</u>, 289 F. Supp. 2d 305, 314 (E.D.N.Y. 2003) (quoting <u>McNair v. New York City Health and Hosps. Corp.</u>, 160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001))); <u>see also Beaumont</u>, 2012 WL 1158802, at *6 ("'[A] plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by "showing that the protected activity was closely followed in time by the adverse [employment] action."'") (quoting <u>Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.</u>, 252 F.3d 545, 554 (2d Cir. 2001) (quoting <u>Reed v. A.W. Lawrence & Co.</u>, 95 F.3d 1170, 1178 (2d Cir. 1996))).

"Mere temporal proximity between a plaintiff's protected activity and an adverse employment action is sufficient to create an inference of retaliation for purposes of proving a <u>prima facie</u> case."  <u>Aka v. Jacob K. Javits Convention Ctr. of New York</u>, No. 09 Civ. 8195(FM), 2011 WL 4549610, at *9 (S.D.N.Y. Sept. 30, 2011) (citing <u>El Sayed v. Hilton Hotels Corp.</u>, 627 F.3d 931, 932-33 (2d Cir. 2010); <u>Simpson v. N.Y. State Dep't of Civil Serv.</u>, 166 F. App'x 499, 502 (2d Cir. 2006)); <u>see also Pinkard v. New York City Dep't of Educ.</u>, No. 11 Civ. 5540(FM), 2012 WL 1592520, at *6 (S.D.N.Y. May 2, 2012) ("[M]ere temporal proximity between a

plaintiff's protected activity and an adverse employment action may, by itself, be sufficient to create an inference of retaliation for purposes of proving a prima facie case.") (citing El Sayed, 627 F.3d at 932) ("By demonstrating temporal proximity between his complaint and his discharge, [plaintiff] arguably established a prima facie case of retaliation under Title VII."); Demaio v. Connecticut Dep't of Corr., No. 3:09-cv-2133(WWE), 2012 WL 892933, at *9 (D. Conn. Mar. 15, 2012) ("Finally, because less than a month elapsed between the Plaintiff's protected activity and the initiation of the March 2005, December 2007, and July 2008 investigations, the temporal proximity of the potentially adverse action to the protected activity permits an inference of causation sufficient to make out a prima facie case of retaliation."); Bind v. City of New York, No. 08 Civ. 11105(RJH), 2011 WL 4542897, at *17 (S.D.N.Y. Sept. 30, 2011) ("'Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection.'") (quoting Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010)).

"In order for temporal proximity to establish causality, [however,] the intervening period must be 'very close.'" Elhanafy, 2012 WL 2122178, at *17 (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001)). The Second Circuit has "not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [but it has held in at least one case] that five months is not too long to find the causal relationship." Gorzynski, 596 F.3d at 110.

Here, there is evidence of temporal proximity between Bagley's protected activity – his complaints to Tufano and Recio that the performance review process was being applied to older workers in a discriminatory fashion – and the adverse employment action – his termination. As to Recio, the record demonstrates that Bagley's complaints to her about age discrimination

were made on July 2, 2009, twelve days before his July 14, 2009 termination.  (Bagley Dep. 111, 145-46)  As to Tufano, Bagley has offered evidence that he began complaining to Tufano about the performance review process – and its discriminatory application to older workers – in December 2008, and that his complaints continued into April 2009.  (See Bagley Dep. 44, 46-48, 77-78, 138; Pltf. R. 56.1 Stmt. ¶¶ 389, 397; Def. R. 56.1 Resp. ¶ 397)  Accordingly, Bagley was terminated less than three months after his last complaint to Tufano about age discrimination. Based on this record, the Court finds that the temporal proximity between the protected activity and Bagley's termination is sufficiently close to establish the requisite causal connection.  See, e.g., Nagle v. Marron, 663 F.3d 100, 111 (2d Cir. 2011) ("While we have not 'drawn a bright line' defining the maximum time period that can give rise to an inference of causation, six weeks fits comfortably within any line we might draw."); Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 168 (2d Cir. 2006) ("Only a short time passed from [plaintiff's protected] speech to the abolition of his job.  The Board abolished [plaintiff's] position on February 26, 2002, a little over three months after his November 7, 2001 letter and only three weeks after his January 31, 2002 press conference.  We cannot agree that these time periods are too long for any inference of retaliatory motive and causation to be drawn."); Forde v. Donahoe, No. 10-CV-2445(CBA)(LB), 2012 WL 1020038, at *11 (E.D.N.Y. Mar. 26, 2012) ("Indeed, in order for temporal proximity to establish a causal connection, the retaliatory acts must occur in 'as few as three months.'") (citation omitted); Flood v. UBS Global Asset Mgmt., Inc., No. 10 Civ. 00374(RJH), 2012 WL 288041, at *18 (S.D.N.Y. Feb. 1, 2012) (finding time periods of one month and six weeks between protected activity and adverse action "short enough to establish causation based on temporal proximity").  Accordingly, Bagley has offered sufficient proof to meet his modest burden at the prima facie stage.

18

**B.**   **Defendant's Legitimate, Non-Retaliatory Reason for Adverse Action**

Once a plaintiff has established a <u>prima</u> <u>facie</u> case, "[t]he burden shifts to the

employer to articulate a legitimate, non[-]retaliatory reason for the adverse employment action."

<u>Sotomayor</u>, 2012 WL 1889780, at *19.  Chase asserts that Bagley failed to satisfy the

requirements of his managerial position by refusing to prepare performance evaluations for

members of his staff.  The Court finds that Chase has satisfied its "relatively light" burden of

production.  <u>See</u> <u>Casalino v. New York State Catholic Health Plan, Inc.</u>, No. 09 Civ. 2583(LAP),

2012 WL 1079943, at *13 n.3 (S.D.N.Y. Mar. 30, 2012).

**C.**   **Pretext**

Although Chase has offered a legitimate, non-retaliatory reason for terminating

Bagley's employment, its summary judgment motion "may still be denied if [Bagley] can show

that [Chase's] proffered reason was a pretext for retaliation."  <u>Beaumont</u>, 2012 WL 1158802, at

*4 (citing <u>Gorzynski</u>, 596 F.3d at 106).

"At the third stage of the <u>McDonnell Douglas</u> test, 'the governing standard is

simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference

that prohibited [retaliation] occurred.'"  <u>Collins v. Connecticut Job Corps</u>, 684 F. Supp. 2d 232,

256 (D. Conn. 2010) (quoting <u>James v. New York Racing Ass'n</u>, 233 F.3d 149, 156 (2d Cir.

2000)) (alterations in original).  At the pretext stage, mere temporal proximity is insufficient,

standing alone, to withstand summary judgment "where the defendant proffers a legitimate

reason for the plaintiff's discharge with evidentiary support therefor."  <u>Galimore v. City Univ. of</u>

<u>N.Y. Bronx Cnty. Coll.</u>, 641 F. Supp. 2d 269, 289 (S.D.N.Y. 2009); <u>see</u> <u>also</u> <u>Aka</u>, 2011 WL

4549610, at *9 ("temporal proximity, without more, 'is insufficient to satisfy [the plaintiff's]

burden to bring forward some evidence of pretext' at the third stage of the <u>McDonnell Douglas</u>

inquiry'") (quoting El Sayed, 627 F.3d at 933) (alterations in original).  A plaintiff may, however, cite to evidence comprising his prima facie case, including temporal proximity, at the pretext stage.  See Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001) ("Under some circumstances, retaliatory intent may . . . be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the [adverse employment action.]"); Laudadio v. Johanns, 677 F. Supp. 2d 590, 615 (E.D.N.Y. 2010) ("As part of the third step in McDonnell Douglas analysis, plaintiff has to establish that the employer's reason for an adverse action was a pretext for retaliation. . . . At this stage, the trier of fact may draw any inferences as to whether the employer's reason is pretextual from the evidence establishing [a] prima facie case.") (citations omitted); Beirne v. Fieldcrest Cannon, Inc., 92 Civ. 3282(JFK), 1997 WL 187340, at *6 (S.D.N.Y. Apr. 16, 1997) ("Where, as here, a plaintiff has established his prima facie case through evidence that the [failure to promote or] termination[] occurred in circumstances giving rise to an inference of discrimination, the plaintiff is permitted to rely on the same evidence to demonstrate pretext.") (citing Chambers, 43 F.3d at 38 ("Pretext may be demonstrated . . . by reliance on the evidence comprising the prima facie case, without more.")); see also Boyle v. HSBC Bank, USA, Inc., No. 08 Civ. 11358(LAK), 2010 WL 235001, at *6 (S.D.N.Y. Jan. 19, 2010) ("[P]laintiff has adduced evidence sufficient for a rational trier of fact to conclude that retaliation was the real reason for the adverse action. First, plaintiff points to the proximity in time between the complaint and HSBC's alteration of plaintiff's responsibilities.").

    "Plaintiff can demonstrate pretext either with direct evidence of . . . retaliation or with indirect or circumstantial evidence."  Milano v. Astrue, No. 05 Civ. 6527(KMW)(DCF), 2008 WL 4410131, at *27 (S.D.N.Y. Sept. 26, 2008) (citing Texas Dep't of Cmty. Affairs v.

Burdine, 450 U.S. 248, 256 (1981)).  To establish pretext, "plaintiff is 'obliged to produce not simply "some" evidence but "sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [retaliation for complaints of discrimination] was the real reason for the discharge."'"  Johnson v. Nicholson, No. 05 CV 2740(JMA), 2007 WL 1395546, at *8 (E.D.N.Y. May 11, 2007) (quoting Melendez v. Monroe Coll., No. 04-CV-2266, 2006 WL 2882568, at *9 (E.D.N.Y. Oct. 6, 2006) (citing Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996))) (alterations in original).  "A plaintiff may show pretext by 'illuminating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons" that would raise doubt in the factfinder's mind that the employer did not act for those reasons.'"  Clarke v. Pacifica Foundation, No. 07 CV 4605(FB), 2011 WL 4356085, at *9 (E.D.N.Y. Sept. 16, 2011) (quoting Bogdan v. N.Y. City Transit Auth., No. 02 Civ. 9587(GEL), 2005 WL 1161812, at *8 (S.D.N.Y. May 17, 2005)).  "A reason given by an employer for its action cannot be proven to be pretextual unless the plaintiff shows that the reason was false and that discrimination or retaliation was the 'real reason.'"  Milano, 2008 WL 4410131, at *27 (emphasis in original) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).  However, "the ADEA [is] 'violated when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause."'"  Eldaghar v. City of New York Dep't of Citywide Administrative Servs., No. 02 Civ. 09151(SC)(HBP), 2008 WL 4866042, at *12 (S.D.N.Y. Nov. 7, 2008) (quoting Terry v. Ashcroft, 336 F.3d 128, 140 (2d Cir. 2003) (quoting Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993))).

Here, viewing the record in the light most favorable to Bagley – as the Court must, see Cifra, 252 F.3d at 216 – he has produced evidence from which a reasonable jury could

find that Chase's reasons for terminating his employment are false and pretextual. More specifically, a reasonable jury could find that Bagley was fired not because – after 27 years of superior performance and numerous promotions (Pltf. R. 56.1 Stmt. ¶¶ 74, 136-43) – he suddenly and unreasonably began refusing to complete performance reviews for certain members of his staff, but rather in retaliation for his refusal to cooperate in a discriminatory scheme aimed at eliminating many of the older workers in his unit. This case thus raises classic issues of intent that are not appropriate for resolution at summary judgment. See Holcomb, 521 F.3d at 137 (expressing the "need for caution about granting summary judgment to an employer . . . where . . . the merits turn on a dispute as to the employer's intent"); Brown, 257 F.3d at 251 (noting "juries' special advantages over judges in th[e] area" of "assess[ing] . . . individuals' motivations and state of mind").

As an initial matter, there is evidence that Carr – the manager responsible for Bagley's firing and for the allegedly discriminatory scheme Bagley objected to – repeatedly made comments showing age animus during the relevant time period. Given that Carr was allegedly targeting the older workers in Bagley's unit, and that Bagley was objecting to this practice, a jury could find Carr's negative remarks about older workers probative on the issue of whether he acted with retaliatory animus towards Bagley. See Terry, 336 F.3d at 150 ("[O]ne type of hostility can exacerbate the [e]ffect of another. Here, hostile racial attitudes could have exacerbated the [e]ffect of retaliation-based . . . hostility and vice versa."); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1086 (3d Cir. 1996) ("As we have recognized, 'an atmosphere of condoned . . . harassment in the workplace increases the likelihood of retaliation for complaints in individual cases.'") (citation omitted).

There is also evidence tending to undermine the legitimacy of the performance review process and supporting Bagley's claim that the evaluation process had been perverted to serve the goal of eliminating older workers.  In late 2008, in contrast to Chase's previous practice, Bagley was told what ratings the employees he managed should receive, and his input concerning an appropriate evaluation was not sought.  This move to pre-determined ratings tends to support Bagley's assertions that the evaluation process had become a cover for eliminating older workers, and that he was fired for his refusal to participate in this charade.

There is also evidence that Tufano, Carr, and Recio knew that Bagley's refusal to issue evaluations for nine of the twenty employees in his unit was not mere insubordination, but instead reflected his belief that the performance evaluation process was discriminatory.  "In light of this evidence and drawing all inferences in [Bagley's] favor, a reasonable jury could conclude that there was no [insubordination] and that [Chase's] proffered reason is a pretext to mask a retaliatory motive."  Aman, 85 F.3d at 1086.

A jury would also be entitled to consider Bagley's claim that the ratings Carr and Tufano allegedly required him to impose on his staff did not fairly reflect their performance, or even Chase's own standards for evaluating employees.  For example, in recommending Bagley's immediate termination, Carr argued that Chase's "review process requires a 20/70/10 split among staff within the department broken down into three ratings categories of E[xceeds Expectations]/M[eets Expectations]/N[eeds Improvement] respectively.  Further breakdown of the 'M' category reflects a 20/40/10 split which represents M1/M2/M3 rankings respectively. . . . [Bagley] refuses to follow [Chase's] criteria and evaluate his staff fairly based on their daily performance, against their peers and in[ ]line with [Chase] standards and guidelines.  [Bagley]

23

insists that his entire staff . . . ranks as either M1 or M2 with no exception."  (Dx 14) (emphasis added).

Chase performance evaluation guidelines are not mandatory, however.  Indeed, the Chase "Manager Briefing" counsels managers to "exercise common sense" and warns that the 20/70/10 guideline "should not be viewed as a precise quota such that individuals receive ratings that do not reflect their contribution."  (Dx 7 at 01036)  In representing that Bagley had violated a mandatory ratings policy, Carr arguably exaggerated the seriousness of Bagley's alleged misconduct.  A jury may infer retaliatory intent where an employer "exaggerated the seriousness of the conduct that allegedly justified the adverse action."  Mugavero v. Arms Acres, Inc., 680 F. Supp. 2d 544, 562 (S.D.N.Y. 2010).

Even if the 20/70/10 ratings distribution (and 20/40/10 distribution within the Meets Expectations category) were mandatory, that would not provide a legitimate basis for terminating Bagley, because Carr himself did not follow these guidelines in rating Bagley's staff. Carr gave no employee an "Exceeds Expectations" rating; 85 percent received a "Meets Expectations" rating; and 15 percent received a "Needs Improvement" rating.  (Pltf. R. 56.1 Stmt. ¶¶ 440-41, 443; Def. R. 56.1 Resp. ¶¶ 440-41, 443)  Carr likewise violated the 20/40/10 distribution within the "Meets Expectations" category, rating 35% of the employees in this category as M3 or "low meets expectations."  (Pltf. R. 56.1 Stmt. ¶ 446; Def. R. 56.1 Resp. ¶ 446)  Therefore, to the extent that Chase argues that Bagley's termination was justified because he refused to follow Chase's ratings guidelines, a jury could conclude that this reason is pretextual.  See Mugavero v. Arms Acres, Inc., No. 03 Civ. 05724(PGG), 2009 WL 890063, at *14 (S.D.N.Y. Mar. 31, 2009) ("Plaintiff has offered evidence showing that prior to April 25, [defendant] would not typically have disciplined an employee solely for consuming alcohol

while on call. . . . Therefore, to the extent Defendants argue that [plaintiff's supervisor's] removal of [plaintiff] from her on call duties was justified by her mere consumption of alcohol while on call, a jury could conclude that this reason for their action is pretextual.").

There is also evidence that Carr and Tufano failed to follow Chase's Corrective Action Policy and practices in effecting Bagley's termination. For example, Carr prepared a memorandum recommending Bagley's immediate termination on June 16, 2009, more than two weeks before Bagley had even been issued a written warning. (Def. R. 56.1 Stmt. ¶ 24; Pltf. R. 56.1 Resp. ¶ 24; Dx 14) Debbie Giles, executive director and head of Human Resources for WSS operations globally, testified that submitting a termination recommendation two weeks before an employee had received a written warning would be "unusual." Indeed, she could not recall a prior instance of such action. (Giles Dep. 155-56) Although Chase's Corrective Action Policy permits a manager to bypass a written warning, both Giles and Recio testified that managers do so only where an employee has committed a "serious infraction[ ]" or has engaged in "gross misconduct." (Recio Dep. 71; Giles Dep. 75-76) Generally, written warnings are bypassed only where an employee has engaged in fraud or caused a "huge financial loss" to the company. (Recio Dep. 73-74)

Although Wheatley prevailed on Carr to issue a written warning to Bagley before terminating him (Def. R. 56.1 Stmt. ¶ 26; Pltf. R. 56.1 Resp. ¶ 26; Dx 15; Wheatley Dep. 148-49), there is evidence that the written warning did not comply with Chase's practices and procedures. For example, the written warning did not contain any time frame in which Bagley was expected to improve or an end date for the restrictions period.[11] (Dx 16) Wheatley testified

---

[11] During the period that a written warning is in effect, a Chase employee is subject to certain restrictions. For example, the employee may not transfer to another job at Chase. This period is known as the "restrictions period." (Giles Dep. 148-51)

that written warnings "generally" indicate a time frame for improvement, so that the employee knows whether improvement is "expected immediately" or within some other time period. (Wheatley Dep. 165-66)  Indeed, the written warning form directs managers to "[i]ndicate performance expectations, plan of action and timeframes for improvement."  (Dx 16) (emphasis added)  It is likewise "standard procedure" for a written warning to include an end date for the restrictions period.  (Giles Dep. 151-52; Wheatley Dep. 165)  Bagley has also offered evidence that the "Final Recommendation for Termination" concerning him was not finalized until after his July 14, 2009 termination (Pltf. R. 56.1 Stmt. ¶¶ 567-74), even though "normally" a manager "should" complete the final recommendation prior to the employee's termination.  (Wheatley Dep. 192)

Although "[v]iolation of an organization's internal procedures alone is insufficient to create an inference of discrimination [or retaliation]," Petrovits v. New York City Transit Auth., No. 95 Civ. 9872(DAB), 2002 WL 338369, at *8 (S.D.N.Y. Mar. 4, 2002) (citing Gibbs v. Consolidated Edison of New York, Inc., 714 F. Supp. 85, 92 (S.D.N.Y. 1989)), "[f]ailure to follow internal procedures can . . . 'be evidence of pretext.'" Id. (quoting Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997)); see also Kauffman v. Maxim Healthcare Servs., Inc., No. 04-CV-2869(TCP), 2006 WL 1983196, at *7 (E.D.N.Y. July 13, 2006) ("Defendant's failure to follow its own 'progressive discipline policy' of notifying Plaintiff of his inadequate performance weighs in favor of Plaintiff's argument that [unsatisfactory job performance, the] proffered reason for his termination[,] was simply a pretext for unlawful discrimination and retaliation."); Sklaver v. Casso-Solar Corp., No. 02-CV-9928(WCC), 2004 WL 1381264, at *9 (S.D.N.Y. May 15, 2004) ("In the present case, plaintiff has demonstrated that defendant elected not to follow its policy of progressive discipline and

instead terminated him summarily, an action that provides some evidence of pretext should the jury . . . reject defendant's proffered explanation.").[12]

Finally, Bagley has presented evidence of retaliatory animus.  In May 2009, when the dispute concerning the mid-year performance reviews was nearing a crisis, Bagley overheard Carr say to Tufano – referring to Bagley – "What are we going to do with this fucking guy?" (Def. R. 56.1 Stmt. ¶ 60; Pltf. R. 56.1 Resp. ¶ 60; Bagley Dep. 67-70)  Tufano later told Bagley that Carr had said that he would have Bagley "sit in the corner cutting coupons all day."[13]  (Def. R. 56.1 Stmt. ¶ 61; Bagley Dep. 69-70; Bagley Aff. ¶¶ 42-43)  Bagley interpreted this comment to mean that Carr intended to make Bagley's "work life miserable."  (Bagley Aff. ¶ 44)[14]  See

---

[12]  Although Chase argues that it has the "unfettered ability to terminate an employee's employment" under its Corrective Action Policy (Def. Reply Br. 6), a jury would be entitled to consider Bagley's evidence that Chase varied from its customary practices and procedures in terminating him.  See Nicholson v. Bd. of Trustees for the Connecticut State Univ. Sys., No. 3:08cv1250(WWE), 2011 WL 4072685, at *8 (D. Conn. Sept. 12, 2011) ("Circumstantial evidence of pretext may include evidence of departures from procedural regularity . . . .") (citations omitted); Norris v. Metro-North Commuter R.R. Co., 522 F. Supp. 2d 402, 409 (D. Conn. 2007) (Plaintiff's former supervisor "acknowledged in his deposition that during his long service at Metro-North he cannot recall a lone remaining applicant not being given a promotion under such circumstances.  Because 'departures from procedural regularity [may] raise a question as to the good faith of the process,' and because the re-posting was apparently at odds with prior Metro-North practice, there is an issue of material fact as to whether a fact-finder could infer discriminatory intent from this failure to promote.") (emphasis added).

[13]  An employee charged with cutting coupons is responsible for taking the redeemable portion of a bond and sending it to paying agents.  This is one of the most menial tasks in Bagley's unit.  (Bagley Aff. ¶¶ 42-43)

[14]  Chase's contention (Def. Br. 17) that this Court must ignore or discount all of Bagley's testimony is misguided.  "In discrimination cases, the only direct evidence available very often centers on what the defendant allegedly said or did. . . . Since the defendant will rarely admit to having said or done what is alleged, and since third-party witnesses are by no means always available, the issue frequently becomes one of assessing the credibility of the parties.  At summary judgment . . . that issue is necessarily resolved in favor of the nonmovant.  To hold, as defendants ask us to do, that the nonmovant's allegations of fact are (because 'self-serving') insufficient to fend off summary judgment would be to thrust the courts – at an inappropriate stage – into an adjudication of the merits."  Danzer v. Norden Sys., Inc., 151 F.3d 50, 57 (2d Cir. 1998); see also Memnon v. Clifford Chance US, LLP, 667 F. Supp. 2d 334, 351 n.16 (S.D.N.Y. 2009) ("[Defendant] objects to [plaintiff's] attempt to raise issues of fact through her 'own self-

Butler v. New York Health & Racquet Club, 768 F. Supp. 2d 516, 535 (S.D.N.Y. 2011) ("While [plaintiff] supports her claim by relying primarily on the temporal proximity between filing her EEOC complaint and these alleged acts of retaliation, she also has offered circumstantial evidence to establish an inference of retaliatory animus.  For example, after [defendant] became aware of [plaintiff's] EEOC filing, [plaintiff's supervisor] described [plaintiff] as 'one dangerous employee.'").

Given (1) the temporal proximity between Bagley's complaints and his termination; (2) the fact that Bagley was terminated by the manager allegedly responsible for targeting older workers, who himself had allegedly made remarks showing age animus, and whose discriminatory scheme Bagley had repeatedly objected to; (3) that Carr himself did not follow the performance review guidelines that he criticized Bagley for refusing to follow; (4) that Tufano and Carr did not follow Chase's normal practices and procedures in terminating Bagley; and (5) the evidence of retaliatory animus, a reasonable jury could conclude that Chase's justification for terminating Bagley was a mere pretext for retaliation.  Accordingly, Chase is not entitled to summary judgment on Bagley's retaliation claim.[15]

---

serving affidavit.'  However, precedent in this Circuit makes clear that certain uncorroborated affidavits by the non-moving party, standing alone, may be sufficient to create a genuine issue of material fact sufficient to survive summary judgment in a discrimination case.").  At summary judgment, the Court must credit Bagley's testimony as to events about which he has personal knowledge.  See Cifra, 252 F.3d at 216.

[15]  Bagley's retaliation claims are brought under the NYSHRL and the NYCHRL as well as the ADEA.  As noted early, retaliation claims brought under the ADEA and the NYSHRL are subject to the same standard.  Sotomayor, 2012 WL 1889780, at *29.  However, "claims brought under the NYCHRL 'must be reviewed independently from and "more liberally" than their federal and state counterparts' in light of the Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 95 (2005)."  Papalia v. Milrose Consultants, Inc., No. 09 Civ. 9257(NRB), 2011 WL 6937601, at *7 n.8 (S.D.N.Y. Dec. 29, 2011) (citations omitted).  Here, because Chase's summary judgment motion fails under the ADEA and the NYSHRL, it is not necessary to separately consider Bagley's claims under the "more liberal" standards of the NYCHRL.  See id.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is denied. The Clerk of the Court is directed to terminate the motion. (Dkt. No. 41)

In accordance with this Court's individual rules, the parties will submit a joint pretrial order by August 11, 2012. Proposed voir dire, requests to charge, and any motions in limine are also due on August 11, 2012. Trial will commence at 9:00 a.m. on September 24, 2012, in Courtroom 6B of the United States Courthouse, 500 Pearl Street, New York, New York.

Dated: New York, New York
July 12, 2012

SO ORDERED.

Paul G. Gardephe
United States District Judge

29